UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

GUY MCEACHIN,

                          Plaintiff,            DECISION AND ORDER
   -vs-                                 No. 06-CV-6453(MAT)

LEONARD BEK, et al.,

                         Defendants.
_____

## I.   Introduction

Pro se plaintiff Guy McEachin ("McEachin" or "Plaintiff"), an
inmate at Attica Correctional Facility ("Attica" or "the Facility")
instituted the instant proceeding pursuant to 42 U.S.C. § 1983.
Presently pending before the Court are Defendants' motions for
summary judgment pursuant to Fed. R. Civ. P. 56 (Dkt. ##55 & 91) on
behalf of the parties who have been served in this action: Leonard
Bek ("Bek"), Family Reunion Program Coordinator at Attica; Sandra
Dolce ("Dolce"), the Deputy Superintendent of Programs at Attica;
John Roach ("Roach"), Senior Corrections Counselor and Chairperson
of the Program Committee at Attica; Mark J. Leonard ("Leonard"),
Director of the Ministerial, Family & Volunteer Services for the
New York State Department of Correctional Services and Community
Supervision ("NYSDOCCS"); John Whiteford ("Whiteford"), a
Corrections Counselor at Attica; James Conway ("Conway"),
Superintendent of Attica; Randy James ("James"), Deputy
Superintendent of Security at Attica; Vance Hawley ("Hawley"),
Darlene Buckley ("Buckley"), and Jennifer Boyce ("Boyce"), all
Registered Nurses at Attica; Lisa Trapasso ("Trapasso"), a Mental

Health Therapist who oversees clinical health services in Attica's Special Housing Unit ("SHU"); and Tom Edwards ("Edwards"), a Physician's Assistant at Attica.

For the reasons that follow, Defendants' Motions for Summary Judgment (Dkt. ##55 & 91) are granted, and the Amended Complaint (Dkt. #34) is dismissed in its entirety.

## II.  Factual Background

Plaintiff's supporting allegations cover numerous, disparate topics. To avoid unnecessary repetition, the facts pertinent to the alleged constitutional violations will be set forth below in the sections addressing Plaintiff's specific claims.

## III. General Legal Principles

### A.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must assess whether there are any material factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. Although "pro se litigants are afforded some latitude in

2

meeting the rules governing litigation[.]" <u>Moates v. Barkley</u>, 147
F.3d 207, 209 (2d Cir. 1998), (citations omitted), they, like all
litigants, must establish more than a mere "metaphysical doubt as
to the material facts[,]" <u>Matsushita Elec. Indus. Co. v. Zenith
Radio Corp.</u>, 475 U.S. 574, 586 (1986), in order to defeat a motion
for summary judgment.

### B.   42 U.S.C. § 1983

To state a claim under 42 U.S.C. § 1983, a plaintiff must
allege (1) that the challenged conduct was attributable at least in
part to a person acting under color of state law, and (2) that such
conduct deprived plaintiff of a right, privilege, or immunity
secured by the Constitution or laws of the United States. <u>E.g.</u>,
<u>Dwares v. City of N.Y.</u>, 985 F.2d 94, 98 (2d Cir. 1993). The § 1983
plaintiff must adequately demonstrate "personal involvement of
defendants in alleged Constitutional deprivations." <u>Colon v.
Coughlin</u>, 58 F.3d 865, 873 (2d Cir. 1995). Personal involvement "is
a prerequisite to an award of damages under § 1983.'" <u>Id.</u> (quoting
<u>Wright v. Smith</u>, 21 F.3d 496, 501 (2d Cir. 994)).

### IV.  Plaintiff's Claims

### A.   Denial of Plaintiff's Family Reunion Program Application (Retaliation)

Plaintiff's due process claims pertaining to the denial of his
application to the Family Reunion Program ("FRP") have already been
dismissed. <u>See</u> Dkt. #7 at 4-5. The Court (Skretny, D.J.) stated,
however, that McEachin might state a cause of action based upon

3

denial of entry into the program to the extent that Defendants' decision was motivated by a retaliatory animus. Id. Accordingly, Plaintiff's claims in his amended complaint alleging retaliatory treatment in connection with the denial of the FRP application must be addressed.

## 1.   Background

On November 7, 2005, McEachin submitted an application to the FRP. Recommendations were sought from various entities including the Guidance Counselor; security personnel; the Family Services Counselor; the Superintendent of Attica, and the Central Office. Plaintiff's guidance counselor did not recommend approval because Plaintiff had not completed anti-aggression group therapy and had refused to participate in an Alcohol Substance Abuse Treatment program on October 28, 2005.  Attica's security personnel did not recommend approval based upon McEachin's involvement in a disciplinary incident on November 9, 2005.  The Family Services Counselor did not recommend approval based upon McEachin's documented disciplinary history and noted that he needed to complete an anti-aggression and substance abuse treatment program. Both the Superintendent of Attica and the Acting Deputy Superintendent of Programs also recommended denial of the application.  On or about January 18, 2006, the Central Office in Albany, New York denied the application.  Plaintiff was notified on January 27, 2006, that his application had been disapproved and that he could reapply.

4

On January 30, 2006, McEachin reapplied for the FRP. On February 3, 2006, Plaintiff was notified that applicants must demonstrate satisfactory behavior throughout the duration of application process. Because he had received keep-lock during the application process, he had not maintained satisfactory behavior, and thus his second FRP application was denied in March 2006.

On September 27, 2006, Leonard notified Plaintiff that he had completed his review of Plaintiff's appeal of the denial of his application to participate in the FRP. Leonard explained that he was not inclined to render a favorable decision, in light of the eight-week sanction in effect due to the period of keep-lock McEachin had received.

### 2.  Analysis

"[A] claim for relief may be stated under section 1983 if otherwise routine administrative decisions are made in retaliation for the exercise of constitutionally protected rights." Gill v. Mooney, 824 F.2d 192, 194 (2d Cir. 1987) (citing Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir. 1986) (per curiam)). "Prisoners, like non-prisoners, have a constitutional right of access to the courts and to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right." Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) (citing Franco v. Kelly, 854 F.2d 584, 589 (2d Cir. 1988)).

The plaintiff "bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating fact in the prison officials' decision to discipline plaintiff." Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996) (citing Mount Healthy Sch. Dist. v. Doyle, 429 U.S. 274, 287 (1977)). The plaintiff must establish that, but for his exercise of a protected right, the alleged wrongful action would not have been taken. Haymes v. Montanye, 547 F.2d 188, 191 (2d Cir. 1976).

With regard to the denial of his first FRP request, it appears that McEachin filed two grievances shortly before he submitted the application—one on September 22, 2005, regarding the Facility's refusal to allow McEachin's son to visit; and one on October 26, 2005, for being denied recreation time. The Second Circuit has held "that such temporal proximity between an inmate's lawsuit and disciplinary action may serve as circumstantial evidence of retaliation." Colon, 58 F.3d at 872 (citing, inter alia, Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983)). Here, however, Defendants have come forward with evidence showing that they would have denied McEachin's FRP applications even if he had not filed grievances. See Graham, 89 F.3d at 79 ("[I]f taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone.") (citing Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir. 1994)).

As noted above, McEachin had failed to participate in required ASAT programming, which was sufficient reason to deny him entry to FRP. Although Plaintiff contends that the Defendants have falsely accused him of refusing to participate in the ASAT program, he failed to substantiate this allegation during discovery.

With regard to the second FRP application, there is no evidence that Defendants had a retaliatory motive. Even if the decision was partially motivated by improper reasons, which the Court does not find to be the case, Defendants would have made the same decision based on a proper reason alone-that McEachin had been sentenced to periods of keep-lock during the application-processing period.

**B.   Plaintiff's Other Claims of Retaliatory Treatment**

**1.   Background**

Besides denying his FRP application, Plaintiff asserts that Defendants retaliated against him for filing administrative grievances in other ways. Essentially, his position is that after he files a grievance, something happens that he believes is negative and is an act of retaliation that is related to the filing of the grievance. See Deposition of Guy McEachin ("McEachin Dep.") at p. 25, lns 17-23 (Question: "You're basically saying that after you file grievances, something odd happens. . .something that you think is related to the grievance, the filing of the grievance. Answer: Right."), attached as Exhibit ("Ex.") A to the Declaration of David J. State, Esq. ("State Decl."). He identified two

incidents of alleged retaliation. The first is that medical staff ordered that his medication be "crushed for no reason." Id. at p. 31, lns 21-24. He claimed, "It was usually given to me whole, and then after I came out of the observation room it started being crushed." Id. at p. 32, lns 13-16.

The second instance involved his wife allegedly being "harassed" when going through the metal detector three weeks after he had received a felonious ticket for an incident in the visiting room. McEachin Dep. at p. 29, lns 13-25. Plaintiff states that as his wife entered the facility, she went through the metal detector and the metal detector sounded repeatedly. After a number of unsuccessful attempts to pass through, she was provided a robe and then was able to clear the metal detector. Id. at p. 30, lns 1-25. She entered the facility and visited Plaintiff without further incident. Id.

As discussed further below, the proffered incidents of alleged retaliation are entirely de minimis, and evidence of a causal connection between the retaliatory treatment and the protected speech is completely lacking.

### 2. Analysis

Plaintiff filed a grievance regarding the pill-crushing, and the matter was investigated. See Bates #0087-0091, attached to State Decl. The investigation revealed that the Plaintiff's medication dosage had been changed on October 5, 2006. There was an entry on his medical records dated November 7, 2006, from his

physician indicating that McEachin's medication should be crushed before it was administered to him. Bates #0089, attached to State Decl. The medical record indicated that crushing the medication did not affect its potency. Id.

In any event, on November 12, 2006, Plaintiff's medication was discontinued at his request. Id. Thus, he cannot demonstrate a causal connection between the crushing of his medication and the grievance, since the instruction to crush the medication occurred before he filed his grievance. Moreover, on the date he states that it started being crushed (November 12, 2006), he elected to discontinue the medication, and that request was honored on November 12, 2006, as indicated by the medical records.

Plaintiff clearly has not come close to demonstrating that Defendants "harbored a retaliatory motive" or that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' actions. Davidson v. Chestnut, 193 F.3d 144, 148 (2d Cir. 1999). Moreover, Defendants have shown by a preponderance of the evidence that they would have acted in the same manner, regardless of the constitutionally protected action of the claimant, and thus the action does not offend the First Amendment. Mount Healthy, 429 U.S. at 287. Contemporaneous documentation by Plaintiff's health care provider—who was not involved in the grievance for which he claims he was subject to retaliation—explains the medical reasons for crushing of Plaintiff's medication.

With regard to the alleged harassment suffered by his wife when she passed through the metal detector at Attica, the Court agrees with Defendants that it is simply beyond belief that Attica personnel would rig the metal detector to sound a "false positive" in order to retaliate against McEachin with regard to a disciplinary incident that had occurred three weeks previously. Furthermore, Defendants have shown by a preponderance of the evidence that they would have acted in the same manner, regardless of the constitutionally protected action, and thus the Defendants' conduct does not offend the First Amendment. It is manifest that a maximum security correctional facility may employ metal detectors to screen visitors entering the prison. See Lowrance v. Achtyl, 20 F.3d at 535 (noting that in the context of prison administration, courts must bear in mind that prison officials have broad administrative and discretionary authority over the institutions they manage).

As with the pill-crushing incident, Plaintiff has not shown that Defendants were motivated by a retaliatory animus, or that the protected conduct was a substantial or motivating factor in the prison officials' actions. Davidson, 193 F.3d at 148.

### C. Denial of Reasonable Accommodations Under the ADA in Connection with Plaintiff's Request to Transfer to a Different Facility

#### 1. Background

On March 24, 2006, McEachin requested a transfer to a facility other than Attica so that he could attend an

10

anger-management/alcohol and substance abuse treatment program. He cited a medical condition (a herniated disk for which he was receiving Flexeril (muscle relaxant) and Ultram (pain reliever)), which prevented him from climbing up and down stairs.  McEachin Dep. at 13.  McEachin contended that Attica did not have the type of programming he required available on the first floor.

When his transfer request was denied, he was informed that he did not need to be moved to a different facility in order to participate in substance abuse and anger management treatment programs. Since both were available on the first floor of Attica, McEachin thus was not required to climb any steps in order to access the programs.

### 2. Analysis

Title II of the Americans With Disabilities Act ("ADA") provides, in pertinent part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. While the Supreme Court has held that Title II of the ADA extends to prisons, see Pennsylvania Dep't of Corr. v. Yeskey, 524 U.S. 206, 213 (1998), the ADA does not provide for liability against individual defendants in either their individual or official capacities, see Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn, 280 F.3d 98, 107 (2d Cir. 2001) ("Insofar as Garcia is suing the individual

defendants in their official capacities, he is seeking damages from New York, and the Eleventh Amendment therefore shields them to the same extent that it shields SUNY."). Consequently, all of Plaintiff's ADA claims against the named defendants must fail as a matter of law.

Moreover, Plaintiff's claim fail on the merits. To succeed on an ADA claim, Plaintiff must show (1) he is an individual with a disability as defined by the ADA in that he has a physical or mental impairment that substantially limits one or more of his major life activities, (2) he was excluded or denied the benefits of some program, activity or service while at Attica on account of his disability; and (3) the alleged violation was motivated by discriminatory animus or ill will based on his disability.

Assuming that Plaintiff has a qualifying disability, he has failed to demonstrate the second and third elements of a prima facie case. Plaintiff was not excluded from any program, activity, or service because of his disability. The type of program he wished to attend was available on the first floor of Attica and did not require him to climb stairs. Plaintiff does not dispute that such a program existed at Attica; his complaint is that he was denied transfer to a different facility to obtain the same treatment that was available and accessible to him at Attica. Because was not entitled to such a transfer under the ADA, it necessarily follows that Defendants did not act with discriminatory animus in denying his request.

### D.   Eighth Amendment Claims

#### 1.   Excessive Force and Cruel and Unusual Punishment by CO Kingsley

##### a.   Background

On July 10, 2007, McEachin was brought to a private interview with a psychiatrist. When he was taken from the private interview room to another area, CO Kingsley allegedly tried to "stick his fingers in [McEachin's] rectum", and punched him three times in the back of the head with a closed fist while he was handcuffed and pinned up against the wall. McEachin Dep. at 42-43. McEachin's grievance regarding this alleged incident was denied on July 24, 2007. McEachin Dep. at p. 42. CO Kingsley denies that this happened and denies physically or sexually assaulting Plaintiff or treating him improperly in any manner.

##### b.   Analysis

###### 1.)   Sexual Assault

The federal courts have recognized that "[s]exual abuse may violate contemporary standards of decency and can cause severe physical and psychological harm" such that "severe or repetitive sexual abuse of an inmate by a prison officer can be 'objectively, sufficiently serious' enough to constitute an Eighth Amendment violation." **Boddie v. Schneider**, 105 F.3d 857, 861 (2d Cir. 1997) (citations and quotation omitted). Although "allegations of sexual abuse may meet both the subjective and the objective elements of the constitutional test, thereby stating an Eighth Amendment claim

under Section 1983," id., McEachin nevertheless has failed to establish such a claim.

Even taking McEachin's uncorroborated testimony as true, he asserts only one incident in which he was touched without his consent. The isolated incident, which did not involve actual penetration, was not severe enough to be "objectively, sufficiently serious" for Eighth Amendment purposes. See Boddie, 103 F.3d at 861. ("The isolated episodes of harassment and touching [including a CO bumping into him "with her whole body vagina against penis pinning [him] to the door"] alleged by Boddie are despicable and, if true, they may potentially be the basis of state tort actions. But they do not involve a harm of federal constitutional proportions as defined by the Supreme Court.") (citing Farmer, 511 U.S. at 833-34); Montero v. Crusie,153 F. Supp.2d 368, 373, 375 (S.D.N.Y. 2001) (allegation that, on several occasions, correctional officer squeezed inmate's genitals while pat-frisking him did not show sufficiently serious deprivation to establish Eighth Amendment violation, particularly when inmate did not allege that he was physically injured by such touching).

### 2.)  Physical Assault

CO Kingsley denies having struck McEachin in the head three times with his closed fist. Even assuming that this occurred, McEachin's claim fails because the application of force against him was de minimis. See Romaine v. Rawson, 140 F. Supp.2d 204, 212 (N.D.N.Y. 2001) ("[T]he prisoner was unable to show any serious

injury resulting from Defendant's strikes to his head. The testimony at trial indicated that the strikes to his head were either three open-fisted slaps or three-closed fisted strikes. Regardless of whether the strikes were open-fisted or closed-fisted, given the lack of any visible injury to Plaintiff, the Court concludes that Defendant's application of force against Plaintiff was de minimis.").

### 2. Excessive Force and Cruel and Unusual Punishment by CO Wilkenson

#### a. Background

On or about July 10, 2007, Plaintiff claims, CO Wilkenson closed an iron feed-up hatch on his "left arm (tricep)", causing pain, numbness, and a scar. See Am. Comp., ¶80 (Dkt. #34). The Facility's documentation of the incident indicates that Plaintiff was ordered to put his hands through the cell hatch for removal of restraints after being placed in an SHU cell. Bates #00326. During this procedure, Plaintiff attempted to pull the handcuffs into the cell. Id. Several officers, including CO Wilkenson, pulled the handcuffs back and unshackled Plaintiff. Bates ##0326, 0341. Nurse Hawley attempted to examine Plaintiff, but he refused the examination and refused to comply with all requests and orders, such as placing his arms near the cell door for examination. Bates ##0327, 0328. Nurse Hawley noted no injuries (i.e. no gross deformity or abnormality), and noted that Plaintiff had a dressing from a previous self-inflicted wound. Id.

###### b.   Analysis

Not "every malevolent touch by a prison guard gives rise to a federal cause of action." Hudson v. McMillian, 503 U.S. 1, 9-10 (1992) (citation omitted). The Eighth Amendment's prohibition against "cruel and unusual punishment "necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Id. (quotations omitted). An excessive force claim contains both a subjective and an objective requirement. E.g., Griffin v. Crippen, 193 F3d 89, 91 (2d Cir. 1999). To fulfill the subjective component, the inmate must show that the prison officials involved "had a 'wanton' state of mind when they were engaging in the alleged misconduct." Davidson v. Flynn, 32 F3d 27, 30 (2d Cir. 1994) (quoting Hudson, 503 U.S. at 9-10). "Thus, the key inquiry under Hudson and its precedents is whether the alleged conduct involved unnecessary and wanton infliction of pain." Sims v. Artuz, 230 F.3d 14, 21 (2d Cir. 2000) (citations omitted).

The contemporaneous documentation by prison personnel supports the conclusion that Plaintiff did not suffer the injuries he claims. At Plaintiff's deposition, Defendants' attorney, David J. State, Esq., asked Plaintiff about any scars. The only one pointed out by Plaintiff was on his left forearm, which is where he cut himself with a razor blade. McEachin Dep. at 57, lns 23-24. Attorney State did not observe any scars on Plaintiff's left

tricep, where CO Wilkenson is alleged to have closed the feed-up hatch.

Even assuming Plaintiff was injured as he has claimed, I find as a matter of law that the force used was de minimis and therefore cannot form the basis of a constitutional claim. See Sprau v. Coughlin, 997 F. Supp. 390, 395 (W.D.N.Y. 1998) (corrections officer grabbed inmate behind the neck and hit him several times across the neck and face and in the eye, and the medical report completed after the incident noted a small bump under inmate's eye; amount of force used was de minimis) (citing Brown v. Busch, 954 F. Supp. 588, 597 (W.D.N.Y.1997) (finding that an officer's pushing, shoving, and striking of an inmate was a de minimis use of force); DeArmas v. Jaycox, No. 92 Civ. 6139 (LMM), 1993 WL 37501, at *4 (S.D.N.Y. Feb. 8, 1993) (determining that an officer's punching and kicking of an inmate was a de minimis use of force), aff'd, 14 F.3d 591 (2d Cir. 1993).

### 3.   Deliberate Indifference by Nurse Hawley

Plaintiff contends that Nurse Hawley was deliberately indifferent to his serious medical needs because he failed to document Plaintiff's injuries after the feed-up hatch incident. This claim fails as a matter of law, for it was Plaintiff's wilful noncompliance which prevented Nurse Hawley him from making an in-depth examination of his alleged injuries. As noted above, Nurse Hawley attempted to examine Plaintiff, but Plaintiff refused to

17

cooperate with the nurse's request to place his arms near the cell-door for examination.

### 4.    Imposition of a Restricted Diet (Cruel and Unusual Punishment)

#### a.    Background

Plaintiff complains that Defendants violated his Eighth Amendment rights by erroneously placing him on a restricted diet from July 4, 2007, to July 9, 2007, and from August 2, 2007, to August 8, 2007.  He claims that the diet was inedible, and caused him to vomit and to become nauseated, weak, and dizzy. Plaintiff also contends that medical staff ignored his medical complaints.

#### b.    Analysis

"Although '[t]he Constitution does not require that sentenced prisoners [receive] every amenity which one might find desirable,' Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), rev'd on other grounds sub nom. Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Eighth Amendment prohibition against cruel and unusual punishment does require that prisoners be served 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.'" Robles v. Coughlin, 725 F.2d 12, 15 (2d Cir. 1983) (per curiam) (quoting Ramos v. Lamm, 639 F.2d 559, 571 (10th Cir. 1980), cert. denied, 450 U.S. 1041

(1981)). Plaintiff has failed to raise a triable issue of fact with regard to any of the elements of this standard.

With regard to the period from July 4, 2007, to July 9, 2007, Defendants do not dispute that Plaintiff was punished for failing to turn in his meal tray and other items by being placed on a restricted diet. See Bates #00316, Ex. to State Decl. NYSDOCCS regulations authorize a restricted diet for an inmate's failure to return eating utensils as this poses a security risk. See 7 N.Y.C.R.R. §304.2; James v. Coughlin, 13 F. Supp. 2d 403, 412 (W.D.N.Y. 1998) (noting that SHU inmates may be placed on a restricted diet when they refuse to obey a direct order to return a utensil at the conclusion of a meal).

Under the applicable regulations, pre-hearing restricted diets are specifically authorized. See 7 N.Y.C.R.R. § 304.2 (c). In McEachin's case, the restricted diet was approved by Dr. Laskowski of Attica's medical staff. See Bates ##00316 & 00284, Ex. to State Decl.  Medical staff monitored McEachin's health while he was on the diet, and no adverse effects were noted. See Bates ##00282-00283, Ex. to State Decl. After Plaintiff wrote a letter dated July 30, 2007, to Superintendent Conway complaining about the restricted diet, see Bates #00318, Ex. to Conway Decl., the matter was investigated and it was found that the restricted diet was appropriate. Conway Decl., ¶12.

With regard to imposition of the restricted diet in August 2007, Plaintiff wrote a letter to Superintendent Conway complaining about, inter alia, the nutritional value of the loaf, the lack of variety, and the poor quality and the dirtiness of the food. See Bates #00322, Ex. to Conway Decl. Plaintiff's complaints were investigated and found to be without merit. See Conway Decl., ¶12 & Bates #00321 (report by Nurse Heltz, noting that "inmate was on the restricted diet from 8-2-07 through 8-8-07. Upon review of his medical file, there's absolutely no documentation of any of these complaints listed in this letter. The PA [Physician's Assistant] makes rounds weekly and none of these complaints were made to him either. I checked with the nurse on rounds in the am and no issues raised at sick call"), Ex. to Conway Decl.

McEachin has failed to raise an issue of fact regarding the propriety of the imposition of the restricted diet. As noted above, prison regulations authorize the imposition of a restricted diet prior to a disciplinary hearing. McEachin admitted at his deposition that he failed to return a utensil at the end of the meal, although he contends he did so in order to get the officers' attention in relation to complaints he had about the amount of food he was receiving. The regulations do not authorize withholding of utensils for protest purposes.

With regard to the nutritional adequacy of the food, or the cleanliness of the conditions under which it was served, Defendants

have come forward with documentation refuting Plaintiff's claims. As a matter of law, McEachin's Eighth Amendment claims premised upon the imposition of a restricted diet on two, relatively brief occasions, fail as a matter of law. See Leach v. Dufrain, 103 F. Supp.2d 542, 547 (N.D.N.Y. 2000) (holding that denial of hot food to prisoner for two-month period as discipline for misconduct was not cruel and unusual punishment, absent showing of nutritional inadequacy or immediate danger to prisoner's health and well-being).

### 5. Unspecified Claims of Deliberate Indifference Against Nurses Boyce and Buckley

Plaintiff's allegations in the complaint regarding Boyce and Buckley are not specific, and his deposition testimony failed to identify any particulars about their allegedly unconstitutional conduct. Both Boyce and Buckley deny in their Declarations submitted in support of Defendants' Motion for Summary Judgment that they had any interactions with Plaintiff. Accordingly, I find that as matter of law, Boyce and Buckley had no personal involvement with McEachin so as to potentially subject them to liability under 42 U.S.C. § 1983. A state employee cannot be held liable under 42 U.S.C. § 1983 absent an allegation and a showing that he or she was personally involved in the violation of the plaintiff's constitutionally protected rights. See, e.g., McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977) (A defendant's personal involvement in the alleged constitutional deprivation is

a prerequisite to obtaining award for damages under 42 U.S.
§ 1983.), cert. denied, 434 U.S. 1087 (1979).

### 6.  Deliberate Indifference by Mental Health Therapist Trapasso

#### a.  Background

McEachin complains that Trapasso, a Mental Health Therapist,
failed to take appropriate steps to prevent him from harming
himself. McEachin testified that he had been placed in the Mental
Health Unit ("MHU") for observation after he became depressed,
developed insomnia, and began hearing voices as a result of
placement in the Special Housing Unit ("SHU"). McEachin Dep. at
35. On or about July 6, 2007, McEachin informed Trapasso that he
was not feeling good, was weak because of the restricted diet, was
delusional, and felt that he wanted to hurt himself. Id. at 38. He
testified that she "took it as a joke." Id. According to McEachin,
Trapasso said to him, "Do whatever you have to do McEachin[,]
you're getting no programs from me." Am. Comp., ¶68 (Dkt. #34).
Trapasso denies making that or any similar statement.

Subsequently, while he was in the shower, McEachin used a
razor blade to inflict a 10-inch laceration on the inside of his
left arm. (Apparently, inmates are permitted to have razor blades
while they are showering.) He also swallowed several razor blades
at the same time. Id. at 48. McEachin was taken to Erie County
Medical Center where he received 21 staples to close the laceration

on his arm and had the razor blades extracted from his stomach. Id. at 48.

In her Declaration in support of Defendants' Motion for Summary Judgment, Trapasso gave a markedly different version of events. While screening McEachin upon his admission to SHU, she noted that he had "a history where he will do whatever it takes to get transferred out of correctional facilities" and that he "willingness and motivation for treatment has appeared to be agenda driven." See Bates ##00719-00722, Ex. to Trapasso Decl. For instance, while he was at Southport in June 2007, McEachin was assessed by individuals from the Residential Crisis Treatment Program ("RCTP") who noted, among other things, that he denied suicidal ideation or intention but did not rule out acting out behavior to achieve his goal of getting transferred out of Southport. Bates #00848, Ex. to Trapasso Decl.

In July of 2007, when the self-harming incident occurred, Trapasso explains that McEachin had four cell-side visits during a one-week period while he was in the SHU. Bates #00857, Ex. to Trapasso Decl. At that time, staff noted that his suicide risk assessment was "LOW" and that he was adjusting to SHU. Id. Trapasso opined that there were "no acute issues, concerns or changes", that there were no acute signs or symptoms, and that the interactions and behavior were consistent with McEachin's diagnosed anti-social personality disorder. Id. Trapasso directed that staff should

23

continue to monitor McEachin, whom she described as "manipulative", "entitled", and "demanding". Id. Trapasso logged follow-up visits with McEachin from July 9, 2007, to July 13, 2007, and noted no acute problems. Bates #00867, Ex. to Trapasso Decl.

### b. Analysis

There are two elements to a prisoner's claim that officials violated his Eighth Amendment right to receive medical care: The plaintiff must show that he had a "'serious medical condition' and that it was met with 'deliberate indifference.'" Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir. 2009) (quotation omitted). "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)).

Negligence on the part of a health care practitioner, even if it rises to the level of medical malpractice, does not, without more, stated a constitutional claim. Chance, 143 F.3d at 703. The Supreme Court has described deliberate indifference as "a stringent standard of fault[,]" Board of the Cty Comm'rs of Bryan Cty, Oklahoma v. Brown, 520 U.S. 397, 117 S. Ct. 1382, 1391 (1997), which is "more blameworthy than negligence," but less culpable than

committing "acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer, 511 U.S. at 834.

Based upon the pleadings in the Amended Complaint and Plaintiff's deposition testimony, the claim against Trapasso appears to be that Plaintiff believed she should have been placed him on "suicide watch" or in some other type of mental health observation unit because he expressed thoughts of self-harm. The Court assumes for purposes of this motion that Plaintiff had a "serious medical need" stemming from his psychiatric issues. See Meriweather v. Faulkner, 821 F.2d 408, 413 (7th Cir. 1987) ("Courts have repeatedly held that treatment of a psychiatric or psychological condition may present a 'serious medical need' under the Estelle [v. Gamble, 429 U.S. 97, 104 (1976)] formulation.") (citations omitted).

Federal courts faced with similar claims have noted that "[w]hether to place a prisoner on suicide watch and what level of precaution to take with an inmate are issues within a professional medical judgment." Gay v. Hammersley, No. 08-59, 2009 WL 596114, at *6 (S.D. Ill. Mar. 6, 2009) (citing Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 261 (7th Cir. 1996) (noting the distinction between a "medical judgment" and deliberate mistreatment: "a medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment" and "[a]t most it is medical malpractice . . .")). It is well settled that "mere

25

differences in opinion regarding medical treatment do not give rise to an Eighth Amendment violation." Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986); see also Estelle v. Gamble, 429 U.S. at 107.

McEachin's mere disagreement with Trapasso's assessment of his mental health status is not an actionable Eighth Amendment claim for purposes of 42 U.S.C. § 1983. Accord Gay, 2009 WL 596114, at *6 ("While Plaintiff disagreed with Defendant's decision not to place him on suicide watch . . . , that does not give rise to civil rights claim for violation of his Eighth Amendment right.") (citing Garvin v. Armstrong, 236 F.3d 896, 897 (7th Cir. 2001)); see also Gay, 2009 WL 596114, at *14 ("Simply put, an inmate does not have a constitutionally protected right to be placed on crisis watch at any time he chooses.").

Moreover, on the facts before the Court, McEachin has not proven negligence on Trapasso's part, much less deliberate indifference to a serious medical need. Trapasso carefully evaluated McEachin prior to his admission in SHU, and she and the medical staff monitored him throughout his stay there. The observation notes are consistent in assessing McEachin's suicide risk as low. Trapasso saw no acute issues, concerns or changes during her own observations of McEachin, but instead noted that his behavior and demeanor was consistent with his diagnosed antisocial personality disorder.

Considering the totality of McEaching's treatment by Trapasso and the timing of his alleged threats of self-harm, the Court finds as a matter of law that even if the Trapasso's treatment decision was erroneous, deliberate indifference cannot be inferred because the decision was not "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment," Estate of Cole, 94 F.3d at 262; see also id. at 263 (prison doctor's diagnosis of pre-trial detainee (who asphyxiated himself with a plastic bag) as a "potential suicide risk" rather than as a "high suicide risk" requiring greater precautions was such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the doctor did not base her diagnosis on such judgment; thus, doctor was not deliberately indifferent to the decedent's serious medical needs) (citation omitted).

### 7. Eighth Amendment Claims Against Edwards Regarding the Restricted Diet

Plaintiff contends that Edwards, a Physician's Assistant, violated his Eighth Amendment rights in relation to Plaintiff's restricted diet. According to Plaintiff, Edwards "signed" for him to placed on the restricted diet, "obviously ignoring the fact plaintiff was/has already lost a considerable amount of weight" and failing to examine Plaintiff prior to his being placed on the diet.

Plaintiff complains that Edwards failed to examine him while he was on the restricted diet.

Contrary to Plaintiff's contention, the restricted diet was not ordered by Edwards but instead was medically approved by Dr. Laskowski. Bates #00204, Ex. to Edwards Decl. Furthermore, as discussed above in this Decision and Order, McEachin's complaints that he was losing weight and was sick from eating the loaf were found to be without merit when investigated by prison medical staff. Finally, nowhere in McEachin's complaints to prison officials regarding the restricted diet does he identify Edwards-or any other medical staff-by name. McEachin's complaints against Edwards fail for lack of personal involvement. See Colon v. Coughlin, 58 F.3d at 973.

### E. Verbal Harassment

Plaintiff has accused CO Kingsley of calling him "nigger", of referring to "nooses" and hanging, and calling him "McSnitching" instead of McEachin. Am. Comp., ¶¶77 and 79; McEachin Dep. at 45. CO Kingsley has denied making these statement or otherwise acting improperly towards Plaintiff.

Prison officials' use of racial epithets or discriminatory comments reflecting racial prejudice do not, without more, violate the Constitution. Wright v. Santoro, 714 F. Supp. 665, 667 (S.D.N.Y.) (comments made by prison official including "Get your black ass out of my office" and "I'll lock your black ass up",

unaccompanied by physical injury, did not amount to a violation of
inmate's Constitutional rights) (citing, inter alia, Johnson v.
Glick, 481 F.2d 1028, 1033 n. 7 (2d Cir.), cert. denied, 414 U.S.
1033 (1973), rejected on other grounds by Graham v. Connor, 490
U.S. 386, 393-94 (1989); Black Spotted Horse v. Else, 767 F.2d 516,
517 (8th Cir. 1985) (holding that "discriminatory statements"
reflecting racial prejudice not actionable under § 1983 where not
shown to be connected with physical injury); Collins v. Cundy, 603
F.2d 825, 827 (10th Cir. 1979) (per curiam) ("Verbal harassment or
abuse of the sort alleged in this case is not sufficient to state
a constitutional deprivation under 42 U.S.C. s 1983.")), aff'd
mem., 891 F2d 278 (2d Cir. 1989). As a matter of law, Plaintiff's
allegations regarding the alleged verbal harassment by CO Kingsley
do not state an actionable claim under 42 U.S.C. § 1983.

### F.    Failure to Respond to Grievances

With regard to Superintendent Conway and Deputy Superintendent
James, Plaintiff's allegations are that they have failed respond to
his complaints. See McEachin Dep. at 50-51 ("Question: You said you
wrote him a lot of letters?" Answer: "Yes;" Question: Is your
complaint basically that he hasn't addressed your concerns? Answer:
"Yes. . . he failed to take corrective action on any of the
issues."). Plaintiff's allegation that Superintendent Conway failed
to take any action is unsupported by the record, which establishes

that Conway did not ignore Plaintiff's grievances. See Conway Decl., ¶9. Some grievances were accepted and some were denied. Id.

Moreover, Plaintiff has not alleged sufficient "personal involvement" by Conway and James in the purported constitutional violations. Rather, it appears that Plaintiff is suing Conway and James based solely on their supervisory positions within NYSDOCCS. Mere "linkage in the prison chain of command," Ayers v. Coughlin,780 F.2d 205, 210 (2d Cir. 1985), is insufficient to make the required showing of "personal involvement", see id. (holding that inmate's claim for monetary damages against State Commissioner of the Department of Correctional Services and superintendent of a correctional facility in civil rights action under 42 U.S.C.A. § 1983 based on fellow inmate's assault required a showing of more than linkage in the prison chain of command to acts of correctional officer who allegedly violated inmate's rights, as doctrine of respondeat superior did not apply to make such defendants liable for officer's acts); accord, e.g., Foreman, 2004 WL 1886928, at *7. The fact that Superintendent Conway affirmed the denial of Plaintiff's grievances is insufficient to establish personal involvement. See id. ("[T]he Superintendent's adoption of the recommendation by the investigating officer cannot by itself demonstrate that he failed to remedy known misconduct. Were it otherwise, virtually every prison inmate who sues for Constitutional torts by prison guards could name the Superintendent

as a defendant since the plaintiff must pursue his prison remedies and invariably the plaintiff's grievance will have been passed upon by the Superintendent.").

## V.   Conclusion

For the foregoing reasons, Defendants' Motions for Summary Judgment (Dkt. ##55 & 91) are granted and Plaintiff's Amended Complaint (Dkt. #34) is dismissed in its entirety with prejudice. The Clerk of the Court is directed to close this case.

**SO ORDERED.**

S/Michael A. Telesca

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:     April 2, 2012
           Rochester, New York